## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

TINA P.,

        *Plaintiff,*

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

        *Defendant.*

_____/

Case No. 1:23-cv-12419

Patricia T. Morris
United States Magistrate Judge

## OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 16)

### A.      Introduction and Procedural History

Tina P. appeals the Commissioner of Social Security's final decision to deny her application for Disability Insurance Benefits ("DIB").  Tina first applied for DIB in June 2014 but was later denied benefits by an Administrative Law Judge ("ALJ") in March 2016.  (ECF No. 9-1, PageID.117, 127).  The following May, Tina filed a new application for DIB and later amended her application to allege that she became disabled in July 2016.  (*Id.* at PageID.83, 268–72).  The Administration denied Tina's claims at the initial level, and an ALJ denied her claims after she appealed the Administration's initial decision.  (*Id.* at PageID.62–79, 144–45).  After the Appeals Council denied review, Tina appealed the ALJ's decision to this Court.  (*Id.* at

1

PageID.33, 1011).  Finding the ALJ's decision deficient in several respects, the Court

remanded this matter to the Administration for further review.  (*Id.* at PageID.1026).

Among other instructions not relevant here, the Court directed the Administration to

discuss whether Tina required a cane to stand or ambulate throughout a workday.

(*Id.*)

On remand, the same ALJ held a second hearing, but again denied benefits.

(*Id.* at PageID.920, 931).  After the Appeals Council upheld the ALJ's decision, Tina

again applied for judicial review.  (*Id.* at PageID.911–12, *see id.* at PageID.1281).

On both parties' stipulation, the Court remanded this matter for a second time with

instructions for the Administration to give "further consideration" as to Tina's need

for a cane and as to the impact of her alleged migraines on her functional abilities.

(*Id.* at PageID.1281–85).

The Administration assigned this matter to a new ALJ, but after conducting

another hearing, the ALJ denied Tina's application for the third time.  (*Id.* at

PageID.1221, 1224).  Without first appealing the ALJ's decision to the Appeals

Council, Tina filed a complaint seeking judicial review.  (ECF No. 1, PageID.3–4, ¶

12).[1]  Both parties consented to the undersigned, magistrate judge "conducting all

---

[1] Although claimants must exhaust all administrative remedies before appealing their denials of benefits to a district court, exhaustion is a "waivable," affirmative defense.  *See Smith v. Berryhill*, 139 S. Ct. 1765, 1773–74 (internal quotation marks omitted).  Because the Commissioner does not challenge Tina's complaint on the grounds that she neglected to exhaust her administrative remedies, the Commissioner has waived this defense.

proceedings in this case, including entry of a final judgment on all post-judgment matters." (ECF No. 11, PageID.1769). The parties have now filed cross-motions for summary judgment. (ECF Nos. 14, 16).

**B.    Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by

substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018).  The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2023); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2023).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the

claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2022)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Tina was not disabled.  (ECF No. 9-1, PageID.1221).  At step one, the ALJ found that Tina had not engaged in substantial gainful activity from July 19, 2016, her alleged onset of disability, through March 31, 2018, her date last insured.  (*Id.* at PageID.1227). At step two, the ALJ concluded that Tina had the following severe impairments: fibromyalgia, status post total bilateral hip replacement, migraines, status post left shoulder replacement, osteoarthritis, and obesity.  (*Id.*)  The ALJ found that Tina's COPD was not severe.  (*Id.*)  At step three, the ALJ found that none of Tina's severe impairments met or medically equaled a listed impairment.  (*Id.* at PageID.1227–28).  Next, the ALJ determined that Tina had a residual functional capacity ("RFC") to perform light work with the following limitations:

> [She] can occasionally reach overhead with the left and frequently reach overhead with the right; no climbing ladders, ropes, or scaffolds; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; no exposure to unprotected heights; occasional exposure to vibration and pulmonary irritants; and the claimant does not require the use of a cane.

(*Id.* at PageID.1228).  At step four, the ALJ found that that Tina could perform her past relevant work as a secretary as that occupation is "generally performed."  (*Id.*

at PageID.1233).  The ALJ did not proceed to step five.  (*Id.*)

### E. Background

#### 1. Overview of Medical Evidence

Tina alleges that she cannot work due to several impairments including migraines, right hip surgery, arthritis. (*See id.* at PageID.287, 1227)

Tina's migraine headaches have long been an issue for her and were considered as part of her prior unsuccessful application. (*Id.* at PageID.119).  During the relevant period, Tina sought treatment from the Memorial Neurological Institute where she reported having headaches three times per week.  (*Id.* at PageID.469). Although her physician's notes describe the headaches as "mild," they also mention that Tina reported her headaches to be "debilitating," "striking[ly]" painful, and "quite bothersome."  (*Id.* at PageID.469, 472).  Tina's headaches were sometimes triggered by stress and aggravated by "light and noise."  (*Id.*)  They also caused "blurred vision" on occasion  (*Id.*)  Her physician stated that Tina's symptoms were "fairly well controlled with medication," but, believing Tina's headaches to be caused by musculoskeletal issues, decided to withhold medication and prescribe physical therapy "aimed at strengthening her cervical paraspinal muscles."  (*Id.*)

At a follow-up appointment, Tina again reported fifteen to nineteen headaches per month, "the majority of which [were] quite severe and debilitating."  (*Id.* at PageID.468).  Her physician did not mention the physical therapy plan Tina was to

begin following her last appointment.  (*Id.*)  But, noting that none of Tina's medications had any "significant benefit," her physician believed she was "a good candidate for a trial of Botox . . . ."  (*Id.*)  Tina's Botox injections relieved her symptoms for months at a time, but her symptoms would sometimes relapse between injections.  (*See id.* at PageID.812, 896, 16401644, 1649, 1652–53).

In January 2017, Tina underwent right-hip arthroplasty.  (*Id.* at PageID.526, 532).  Tina reported no complications four weeks following her surgery.  (*Id.* at PageID.777).  But at her one-year check-up, Tina reported "pain in her buttocks muscle but" felt "as though it may" have been "related to sciatica rather than her hip."  (*Id.* at PageID.901–02).  Tina also reported that her left hip was getting worse, but she had no pain in her right hip, could walk up to five blocks, climb stairs with a banister, and was extremely satisfied with her joint replacement.  (*Id.*)  Her physician "encouraged" her "to engage in any activity [she] desire[d]" but to avoid "impact loading activities[] or lifting items greater than [fifty] pounds . . . ."  (*Id.* at PageID.902).

In 2016, physicians found osteoarthritis at the base of the first digit of Tina's right hand.  (*Id.* at PageID.406).  In October 2016, Tina complained of numbness, although her sense of touch was intact and displayed full strength in her upper and lower extremities.  (*Id.* at PageID.473, 476).  A year later, Tina displayed abnormal

results during a grind test on her right hand and wrist.  (*Id.* at PageID.759).  An "allen's test" performed on both hands was unremarkable.  (*Id.*)

### 2.    Function Report

Tina completed a function report for her DIB application in April 2016.  (ECF No. 9-1, PageID.297).  She stated that "[s]tanding or sitting long period[s] of time hurts both [her] hips."  (*Id.*)  She had "spurs and [two] herniated disc in [her] back which [made] it hard" for her "to sit or stand for long periods of time."  (*Id.*)  She also had "bad migraines that come and go a lot . . . ."  (*Id.*)

Tina's condition did not affect her ability to bathe, care for her hair, shave, or feed herself, although she sometimes needed help dressing and using the toilet. (Id. at PageID.298–99).  She prepared meals daily but other tasks took "longer" because of her pain.  (*Id.* at PageID.299).

Tina admitted that she could perform household chores such as dusting, laundry, vacuuming, and sorting clutter.  (*Id.*)  She also stated that she tried to go outside every day.  (*Id.* at PageID.300).  For example, she would also shop for groceries about once per week.  (*Id.*)  Because she often had to take breaks, grocery shopping took her about an hour to complete. (*Id.*)

Tina enjoyed birdwatching and watching television, but she often had to change positions during these activities because she experienced pain after sitting in one spot for too long.  (*Id.* at PageID.301).

Plaintiff alleged that her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and handle objects have all been affected by her impairments. (*Id.* at PageID.302).  She alleged that she could walk for no more than fifty feet without taking a two-to-three-minute break.  (*Id.*)  She claimed that she used a prescribed cane whenever she had "trouble" standing or walking.  (*Id.*)

### 3.     The Administrative Hearing

### i.     The Medical Expert's Testimony

Following this Court's latest remand, the ALJ held a remote hearing in which he heard testimony from Tina, a vocational expert ("VE"), and a medical examiner ("ME").  (*Id.* at PageID.1246).  The ALJ began the hearing by examining the ME. (*Id.* at PageID.1247).  First, he asked the ME to list Tina's medically determinable impairments.  (*Id.* at PageID.1248).

The ME did not give a direct answer.  Although the ME discussed two diagnoses that he found were not medically determinable—that is, "established by objective medical evidence from an acceptable medical source"— he did not list which impairments, if any, he found to be medically determinable.   (*Id.* at PageID.1248–49); 20 C.F.R. § 404.1521.  The ME did mention a few of Tina's surgeries and treatments, such as her right hip and left shoulder replacements.  (ECF No. 9-1, PageID.1249).   But he did not clarify whether the impairments that

warranted these treatments or Tina's status while recovering from these treatments were medically determinable or severe for purposes of step two. (*Id.*)

At any rate, the ME then opined that Tina had the RFC "to lift or carry [ten] pounds and [twenty occasionally]," sit for a total of six hours during an eight-hour workday, and stand or walk for a total of six hours. (*Id.* at PageID.1249–50). Although he found "nothing in the record to indicate . . . decreased functionality" in Tina's shoulders, he suggested that she could lift her left arm overhead occasionally and that she could lift her right arm overhead frequently. (*Id.* at PageID.1250). He suggested that Tina could perform "(INAUDIBLE) manipulation" occasionally, and, in "deference" to her complaints of pain, he opined that she could stoop, crawl, and kneel occasionally. (*Id.*) The ME also opined that Tina could not be exposed to unprotected heights, pulmonary irritants, or "vigorous vibrations." (*Id.*) He did not believe that Tina required a cane to "ambulate and balance." (*Id.*)

The ALJ then allowed Tina's attorney to examine the ME. (*Id.* at PageID.1251). Counsel first asked the ME whether he noticed that Tina had surgery on her right hip shortly after her insurance expired. (*Id.*) The ME admitted that he overlooked that record and conceded that Tina's "right hip became more of an issue over time." (*Id.*) Still, he remarked that the "last" record he reviewed regarding her right hip was an X-ray from September 2018 which revealed no "significant arthritic disease." (*Id.*) The ME also acknowledged that Tina complained of pain and

pursued physical therapy for her hips, but he opined that hip replacements "shouldn't" cause "significant residuals," and he dismissed Tina's complaints as "purely subjective." (*Id.*) The "purpose" of his testimony, in his view, was to identify "objective support for [Tina's] complaint[s]." (*Id.* at PageID.1251–52; *see also id.* at PageID.1256 ("I am going by objective evidence. I can't surmise. I can't guess. I can't take the word of a physical therapist. I need to see objective evidence.")).

Counsel later turned to Tina's migraines. The ME testified that while he believed that Tina experienced "headaches," the record contained insufficient evidence for him to diagnose her with "migraines." (*Id.* at PageID.1254–55, 1256–57). He testified that although physicians "had difficulty relieving [Tina's] pain and . . . tried numerous medications," they eventually provided an "aggressive treatment" consisting of "Botox injection[s]." (*Id.* at PageID.1254–55).

Last, Counsel examined the ME regarding Tina's arthritis. The ME testified that the objective evidence in Tina's medical record supported a diagnosis of osteoarthritis rather than rheumatoid arthritis. (*Id.* at PageID.1257–58). Because serological testing did not detect rheumatoid arthritis, he suggested that other evidence such as nodules, X-rays showing "erosion" in Tina's right hand, and "nail pitting" only evidenced osteoarthritis. (*Id.*) The ME also dismissed abnormal results from a "grip strength test" because they were "subjective." (*Id.* at PageID.1258).

12

The ME did not clarify whether he believed this test was not useful for assessing Tina's RFC or for distinguishing between osteoarthritis and rheumatoid arthritis under step two of his evaluation. (*Id.*) He did, however, state that the presence of osteoarthritis in one's fingers does not necessarily cause "excessive[]" limitations, even if it reduces "grip strength." (*Id.*)

### ii.   Tina's Testimony

After Counsel concluded his examination, the ALJ questioned Tina. (*Id.* at PageID.1259). When she was insured, Tina could walk for ten minutes continuously and sit for less than an hour before she would need to stand. (*Id.* at PageID.1263–64). She could reach "just above eye level" with her right arm only. (*Id.* at PageID.1265). At the time of the hearing, Tina could walk for twenty minutes continuously, lift a half-gallon of milk, and drive a car, but she could not reach overhead with either arm. (*Id.* at PageID.1263–65).

Tina explained that she continued to have migraines three to eight times per month. (*Id.* at PageID.1268). When she had migraines, Tina would lie down for up to an hour to relieve her symptoms. (*Id.* at PageID.1267–68).

Tina also testified that she continued to use a cane. (*Id.* at PageID.1268). At the time of the hearing, she "sometimes" used a cane to maintain her balance when travelling outside of her home. (*Id.* at PageID.1268–69). While at home, Tina did

not use a cane because she had other "things that she [could] grab" for balance.  (*Id.* at PageID.1269).

### iii.    The Vocational Expert's Testimony

After Tina testified, the ALJ examined a Vocational Expert.  (*Id.* at PageID.1274).  The ALJ asked the VE to assume a hypothetical person with the same age, education, and work experience as Tina who could perform a full range of "light" work except that the individual could only: (1) "sit for six hours" per workday, (2) stand or walk for six hours per workday, (3) occasionally reach overhead with her left arm,  (4) frequently reach overhead with her right arm; occasionally perform "postural" movements, and (5) occasionally tolerate exposure to "vibration[s]" and "irritants."  (*Id.* at PageID.1275).  The individual could not climb "ladders" or work at "unprotected heights."  (*Id.*)

The VE testified that an individual with these limitations could perform Tina's past work as a "secretary," but that she could not perform her past job as a "cashier." (*Id.* at PageID.1275–76).  The VE also testified that the same individual could perform Tina's past work as a cashier if she required "a cane only to ambulate distances."  (*Id.* at PageID.1276).  But if that individual required a cane to both walk and "balance," then she could not perform Tina's past work.  (*Id.* at PageID.1276–77).

The ALJ then asked the VE whether the hypothetical individual could perform "any job in the national economy," including Tina's past work as a cashier, if she would be off task for more than fifteen percent of the workday. (*Id.* at PageID.1277). The VE responded that this individual could not find work. (*Id.*)

Last, the VE testified that if the hypothetical individual "has days" where she would miss at least some of the workday, then the individual could not perform any jobs available at significant numbers in the national economy. (*Id.* at PageID.1278–79).

### F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations at the time the application was filed carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of

opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id*. §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id*. §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r*

*of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of*

*Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC.  The statute lays the groundwork for this, stating, "[a]n individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require."  42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.  The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(2).

According to SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling.  SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  This analysis and the conclusions drawn from it— formerly termed a credibility determination—can be disturbed only for a "compelling reason."  *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain.  20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016).  The ALJ evaluates complaints of

disabling pain by confirming that objective medical evidence of the underlying condition exists.  The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain.  *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994).  The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms.  SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled."  20 C.F.R. § 404.1529(a).  The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March

16, 2016).

### G.    Analysis

#### 1.    Mental Limitations

Tina first argues that the ALJ erred by declining to adopt findings from a prior DIB application regarding her depression.  (ECF No. 14, PageID.1783–85).  In 2016, a previous ALJ issued a decision finding that from September 2014 through March 2016, Tina's depression was a severe, medically determinable impairment that limited her to "simple, routine, [and] repetitive work."  (ECF No. 9-1, PageID.114, 117, 119, 121).  Yet the ALJ here neither recognized Tina's depression as a severe impairment nor included any mental limitations in his RFC finding.  (*Id.* at PageID.1227, 1228, 1232).

Tina argues that under *Drummond v. Comm'r of Social Security* and Acquiescence Ruling 98-4(6), the ALJ was required to adopt the prior ALJ's findings "unless" he found "new and material evidence relating" to Tina's depression.  (ECF No. 14, PageID.1783–85 (cleaned up) (first citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); and then quoting SSAR 98-4(6), 1998 WL 283902 (June 1, 1998)).  Because the ALJ deviated from the 2016 decision without citing any "new and material evidence" concerning her depression, Tina asks the Court to remand.  (*Id.*)

20

In *Drummond*, the Sixth Circuit held that where an ALJ makes a final determination concerning a claimant's entitlement to benefits, all of the ALJ's *findings* bind the parties in all subsequent applications absent evidence of a "changed condition."  126 F.3d at 842.  The *Drummond* Court reasoned that "principles of res judicata" prevent ALJs from challenging earlier findings, absent changed circumstances.  *Id.* at 841–42.  A few years after *Drummond*, the Social Security Administration promulgated SSAR 98-4(6) which instructed ALJs that under *Drummond*, they "must adopt" findings from earlier decisions, "unless there is new and material evidence relating" to the prior ALJ's finding.  SSAR 98-4(6), 1998 WL 283902, at *3; *see also* SSAR 98-3(6), 1998 WL 283901, at *3 (June 1, 1998) (citing *Dennard v. Sec'y of Health & Hum. Servs.*, 907 F.2d 598 (6th Cir. 1990)).  And in several unpublished decisions following *Drummond*, the Sixth Circuit applied this rule even where the new application concerned periods of time that were not addressed by the Administration's prior decision.  *See, e.g.*, *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015); *Haun v. Comm'r of Soc. Sec.*, 107 F. App'x 462, 464 (6th Cir. 2004).

But Tina overlooks that the Sixth Circuit has since narrowed the scope of *Drummond*.  In *Earley v. Comm'r of Soc. Sec.*, the Sixth Circuit explained that the *Drummond* Court "overstate[d]" how res judicata applied to subsequent applications.  893 F.3d 929, 933 (6th Cir. 2018).  The Court held that while the

*Drummond* Court was correct that "res judicata may apply to administrative proceedings," res judicata only prevented subsequent applications "for the same period of time," that was considered in the prior application. *Id.* Thus, ALJs are not bound by prior findings when considering periods of disability that succeed the time period adjudicated in the earlier decision. *Id.* Indeed, because "human health is rarely static" an "earlier proceeding . . . could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Id.* ALJs, therefore, must "giv[e] a fresh look" to periods of disability that were not addressed in the prior ALJ's decision. *Id.* at 931, 934.

That is not to say that an ALJ must "ignore" a prior ALJ's findings—"[a] later [ALJ] may" at least "consider what an earlier ALJ did . . . ." *Id.* at 934. An applicant whose "second filing mimics the first one" should "not have high expectations about success." *Id.* at 933. But an ALJ may choose to ignore a prior ALJ's findings and assign a different RFC if supported by substantial evidence. *See id.* at 933. A prior decision is simply "precedent," not an anchoring point for all subsequent applications. *Id.* at 933–34.

In her reply brief, Tina fails to recognize that *Earley* abrogated SSAR 98-4(6), implying that the existence of "new evidence" or "a new regulatory threshold" are prerequisites for departing from a prior decision under *Earley*. (ECF No. 19, PageID.1851–52). But *Earley* requires no such thing. Instead, it instructs ALJs to

conduct a "fresh review" of the evidence in each application. *Earley*, 893 F.3d at 933–34. And a "fresh review," the Court explained, is one "that treats decisions from prior applications as persuasive, but not binding, even '*absent*' a material change in the claimant's condition." *Lockwood v. Comm'r of Soc. Sec.*, No. 2:21-cv-12891, 2022 WL 3571897, at *13 (E.D. Mich. Aug. 2, 2022) (quoting *Earley*, 893 F.3d at 933–34 (emphasis added)). Even where a subsequent application contains no "new and material evidence," an ALJ is not bound by any findings from prior applications. *Al Jalham v. Comm'r of Soc. Sec.*, No. 18-12595, 2019 WL 7584406, at *4 (E.D. Mich. Aug. 26, 2019). Thus, the ALJ did not err by deviating from the 2016 decision without supporting that choice with new and material evidence regarding Tina's depression.

True, although *Earley* required the ALJ to "at a minimum, recognize that he" had "the option to choose between" adopting and discarding findings in the 2016 decision even in the absence of new and material evidence, the ALJ did not explicitly mention the 2016 decision. *Lockwood*, 2022 WL 3571897, at *13; (ECF No. 9-1, PageID.1227–33). Nor, for that matter, did he cite *Earley* or the cases and acquiescence rulings it abrogated. (ECF No. 9-1, PageID.1227–33).

Even so, the ALJ did not indicate that he was unaware of his options by neglecting to cite *Earley* or the 2016 decision. The ALJ did not suggest that he felt bound to depart from the 2016 decision. (*Id.*) And nothing in the ALJ's decision

suggests that he was unaware of the 2016 decision and thus did not realize he could have afforded precedential weight to the findings from Tina's 2014 application.  (*See id.*)   While he was required to consider all evidence in the record, including the past decisions, the ALJ need not have cited every piece of evidence in the record to show that it was considered.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)).  And his discussion of Tina's depression indicates that he considered the 2016 findings.  To start, the ALJ cited several exhibits submitted before Tina's first hearing following her 2016 application, all of which were submitted alongside a copy of the 2016 decision from her prior application.  (*Compare* ECF No. 9-1, PageID.26–28, *with id.* at PageID.1227, 1230 –33) (citing medical records dated between May 2015 and February 2018)).

More to the point, the ALJ discussed a prior administrative finding from a nonexamining psychiatrist who adopted the psychiatric findings from the 2016 decision by applying SSAR 98-4(6).  (*See id.* at PageID.137, 143).  Indeed, the ALJ's sole discussion of Tina's depression is confined to a single paragraph in his RFC analysis, in which he explains his rationale for rejecting the psychiatric consultant's opinion that Tina had a "severe" adjustment disorder.  (*Id.* at PageID.1232).[2]  By

---

[2] The ALJ does not discuss Tina's mental impairments in the section of his opinion labelled as his step two analysis.  (*Id.* at PageID.1227).  This poor organization is not an error by itself, *see Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016), but it creates

discussing this opinion, the ALJ appears to have been aware of the 2016 decision and its findings.[3]

## 2.   Manipulative Limitations

Next, Tina challenges the ALJ's conclusion that she could manipulate her hands and fingers without limitation despite her osteoarthritis.  (See ECF No. 14, PageID.1787–89).  Though her brief could be clearer on this point, Tina seems to argue that the ALJ reached this finding solely by deferring to the ME's opinion that her osteoarthritis did not limit her ability to handle, finger, or feel.  (*See id.*; *see also* ECF No. 19, PageID.1857–58).  But the ME's opinion, she argues, was flawed in

---

some ambiguity as to how the ALJ factored Tina's depression into his RFC assessment. Because the ALJ did not explicitly mention the consultant's RFC finding, he appears to have either (1) found Tina's depression not to be medically determinable and then declined to consider its effects on her RFC or (2) found that Tina's depression was a nonsevere, although determinable, impairment that did not impact her RFC.  (*See* ECF No. 9-1, PageID.1232).  Either way, the ALJ did not err.  If he found that Tina's depression was not medically determinable, then he need not have considered its impact on her RFC.  *Prater v. Kijakazi*, No. 3:21-CV-00243, 2022 WL 1748611, at *2 (W.D. Ky. May 31, 2022).  And even if he found her depression to be medically determinable but nonsevere, his discussion adequately explains both why he found her impairment to be nonsevere and why he found no mental functional limitations.  Thus, the ALJ need not have repeated his analysis in two separate discussions.  *See Sterner v. Comm'r of Soc. Sec.*, No. 20-12099, 2022 WL 684567, at *3 (E.D. Mich. Feb. 16, 2022).

[3] Further, the ALJ supported his findings regarding Tina's mental impairments with substantial evidence.  The record, to be sure that, contains evidence that Tina received treatment for depression and reported symptoms to her providers.  (See ECF No. 19, PageID.1853–54 (collecting citations)).  Yet Tina testified that she received no "psychiatric treatment" with a "mental health specialist" since "2016."  (ECF No. 9-1, PageID.1266). And the ALJ recognized that her psychiatric evaluations were "largely" unremarkable, she had "minimal complaints" of mental health issues, and she received modest treatment for her depression.  (*Id.* at PageID.1232).

two respects.

First, the ME incorrectly described her abnormal grip strength test results as "subjective" evidence rather than "objective" evidence.[4]   (ECF No. 14, PageID.1793–95).  Although she does not clarify why this distinction matters, Tina appears to suggest either that (1) inconsistent with the regulations, the ME disregarded this evidence purely on the grounds that Tina's subjective complaints were uncorroborated by objective evidence or (2) the ME did not find her osteoarthritis to be a medically determinable impairment due to the lack of objective evidence.  (*See id.*)   Second, Tina claims that the ME also made a contradictory statement that the presence of osteoarthritis in Tina's fingers could diminish her grip strength without causing functional limitations.  (*Id.* at PageID.1789).  Tina does not discuss whether the ALJ relied on this statement.  (*Id.*)

The murkiness of Tina's argument is likely a product of the ME's failure to clearly explain how her osteoarthritis factored into his analysis.  To start, it is not clear whether the ME found that Tina's osteoarthritis limited her functional abilities. While summarizing his opinions on Tina's functional abilities, the ME opined that "(INAUDIBLE) manipulation could be performed frequently."  (ECF No. 9-1,

---

[4] Neither the ALJ's decision nor the parties' briefs cite these test results.  (ECF Nos. 14, 16, 19).  And while Tina's Counsel purported to cite these records when examining the ME, the pages he referenced do not mention a grip strength test.  (ECF No. 9-1, PageID.1258 (citing *id.* at PageID.1492–95)).  Even so, the ALJ references this test in his decision and appears to assume its existence.  (ECF No. 9-1, PageID.1229).

PageID.1250).  A claimant's ability to "manipulate" describes his or her ability to move and handle objects.  Programs Operations Manual System ("POMS") DI § 25225.045(A); *see* SSR 85-15p, 1985 WL 56857, at *6–7 (Jan.1, 2006).  The Administration recognizes three categories of "manipulation": (1) "climbing and balancing"; (2) "stopping, kneeling, crouching, and crawling"; and (3) "reaching, handling, fingering, and feeling."  SSR 85-15p, 1985 WL 56857, at *6–7.  Because the ME's only other opinion on Tina's ability to manipulate related to her ability to stoop, kneel, crouch, and crawl, his testimony could have referred either to her ability to climb or balance or to her ability to handle, finger, or feel.  *See id.*

Even if the ME did opine that Tina had an unrestricted ability to handle, finger, or feel, it is not clear whether the ME discounted her osteoarthritis because he found her subjective complaints to be unsupported by objective evidence.  To be sure, the ME (and by extension, the ALJ) could not "reject" Tina's allegations regarding the "intensity and persistence" of her "symptoms . . . solely because the available objective medical evidence [did] not substantiate [her] symptoms."  20 C.F.R. § 404.1529(c)(2).  But the distinction between subjective and objective evidence may be relevant in determining whether an impairment is medically determinable.  *Id.* § 404.1521.  And if an impairment is not medically determinable, then the ALJ need not consider the impact of that impairment on the claimant's RFC.  *Id.* § 404.1520(a)(2).

But as discussed above, the ME never explicitly listed which impairments he found severe.  (ECF No. 9-1, PageID.1248–49).  And throughout his testimony, the ME gave inconsistent statements regarding how he assessed subjective evidence.  At one point, for example, the ME stated that he found several postural limitations despite a lack of objective evidence, "in deference to" Tina's alleged "pain."  (*Id.* at PageID.1250).  Yet at other times, he indicated that he discounted Tina's subjective complaints of pain where he believed that the record contained insufficient objective evidence to support her complaints.  (*See, e.g.*, *id.* at PageID.1251–52, 1253, 1256, 1258).

The ME's evaluation of the objective and subjective evidence regarding Tina's osteoarthritis is just as ambiguous.  At times, the ME appeared to distinguish between subjective and objective evidence to explain why he did not find Tina's rheumatoid arthritis, as opposed to osteoarthritis, to be medically determinable.  (*Id.* at PageID.1257–58).  Yet the ME also acknowledged that Tina "ha[d] osteoarthritis" and stated that subjective complaints, even those stemming from osteoarthritis, are inadequate to show "excessive[]" functional limitations.  (*Id.* at PageID.1258).

In short, the ME did not clearly state whether he found Tina's osteoarthritis to be medically determinable, whether he considered Tina's subjective complaints when assessing her RFC, or whether he accounted for her osteoarthritis in his RFC findings.  But the Court's task is to review the ALJ's RFC findings, not the ME's

opinions.   And the ALJ's findings concerning Tina's osteoarthritis are just as ambiguous as the ME's testimony.

An ALJ must articulate his or her reasoning well enough for a reviewing court to understand the basis for his or her findings.  *See Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 WL 96920, at *3–4 (6th Cir. 1999) (quoting *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir.1985)).  Put another way, an ALJ's decision must create a "logical bridge" between the evidence and the ALJ's findings.  *Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 829–30 (E.D. Mich. 2017).

The ALJ here creates no such logical bridge.   Unlike the ME, the ALJ explicitly recognized Tina's osteoarthritis as a medically determinable impairment. (ECF No. 9-1, PageID.1227).  Yet during his RFC discussion, he mentions Tina's ability to manipulate her hands only twice: once when acknowledging the ME's testimony that her "grip strength test" was a "subjective test," and again when summarily rejecting a prior administrative medical finding that Tina could only frequently handle and feel because he found the ME's findings more persuasive.  (*Id.* at PageID.1229, 1232–33).

This thin discussion does not explain why the ALJ concluded that Tina's osteoarthritis did not inhibit her use of her hands.  Start with the ALJ's statements regarding Tina's "grip strength test."   Although the ALJ might have used this

evidence to determine that Tina's osteoarthritis was not medically determinable insofar as it affected her hands, he instead found all of Tina's alleged "osteoarthritis" to be medically determinable.   (ECF No. 9-1, PageID.1227); *see* 20 C.F.R. § 404.1521).   And for good reason: the record contains objective evidence of osteoarthritis in Tina's hand, and the ME himself appears to have acknowledged that Tina had osteoarthritis in her fingers. (*E.g.*, ECF No. 9-1, PageID.407, 1492; *see id.* at PageID.1257–58).

At any rate, the ALJ's mere recognition that the ME described Tina's "grip strength test" as "subjective" says nothing about how the ALJ evaluated this evidence.   The ALJ did not, for example, state that he discredited evidence of pain and weakness in Tina's hands "*because*" that evidence was subjective.   (*Id.* at PageID.1229).   And even if he had, the regulations do not allow him to discredit subjective complaints of pain caused by medically determinable impairments due to the absence of corroborating objective evidence.   20 C.F.R. § 404.1529(c)(2).

That leaves the ALJ's reliance on the ME's testimony as the only perceptible basis for his finding.   The ALJ provides two reasons for adopting the ME's opinion over the prior administrative medical finding that Tina could only frequently handle and finger objects.   First, he "afford[ed] greater weight to" the ME's opinions because he believed they were "more consistent" with the record.   (ECF No. 9-1, PageID.1232–33).   But it is not clear whether the ME even disagreed with this

medical opinion as his testimony regarding Tina's manipulative abilities was not completely transcribed.  (*Id.* at PageID.1250).  And even if the ME had opined that Tina had no limitations and provided a clear explanation, the ALJ does not explain *why* he found the ME's opinion to be "more consistent" with the record than prior administrative medical finding.  (*Id.* at PageID.1232); *see Bailey*, 1999 WL 96920, at *3–4.

Second, the ALJ remarks that the state agency medical consultant supported her finding with evidence that Tina had "rheumatoid arthritis of the hands."  (ECF No. 9-1, PageID.1232).  Yet, the ALJ reasons, the ME found no objective evidence from which Tina could be diagnosed with rheumatoid arthritis.  (*Id.*)  Fair enough, if rheumatoid arthritis was the only impairment that could have reasonably been expected to cause "pain[,] . . . tingling [,] and numbness in" Tina's hands, then this would be a valid basis for rejecting the state consultant's opinion.  (*Id.* at PageID.305); *see* 20 C.F.R. § 404.1529(b).  But both the ALJ and the ME recognized that Tina's osteoarthritis affected her fingers, and the ALJ does not explain why Tina's subjective complaints were consistent with rheumatoid arthritis but not with osteoarthritis.  (*See* ECF No. 9-1, PageID.1227, 1231, 1257–58).  Whatever the underlying cause, Tina's symptoms are the same.  Recognizing that rheumatoid arthritis was not the source of Tina's symptoms does not explain why the ALJ discredited her subjective complaints.

At bottom, regardless of whether the ALJ could have relied on substantial evidence in finding that Tina's osteoarthritis did not diminish her ability to manipulate objects with her hand objects, he did not explain his rationale in enough detail for the Court to follow his reasoning.[5]  Thus, the Court remands this matter under sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ must provide a detailed, coherent explanation for his findings regarding Tina's ability to handle, finger, or feel objects.

### 3.  Migraines and Headaches

Tina raises similar concerns regarding the ALJ's evaluation of her migraines and headaches.  She argues that the ALJ violated this Court's most recent remand order (entered by stipulation), instructing the ALJ to "giv[e] further consideration to . . . whether [Tina's] headaches affect her residual functional capacity."  (ECF No. 14, PageID.1771, 1789–91, 1801 (citing ECF No. 9-1, PageID.1281)).  That is because the ALJ adopted the ME's opinion that he could not find that her headaches caused functional limitations without underlying objective evidence.  (*See id.*)  Yet, according to Tina, under SSR 19-4p "the assessment of migraine existence and

---

[5] To be sure, Tina might not have intended to identify this precise error.  Yet this District has often recognized that "in Social Security cases, the failure to submit a particular legal argument is 'not a prerequisite to the Court[] reaching a decision on the merits[] or . . . finding, *sua sponte*, . . . grounds for reversal." *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *11 n.2 (E.D. Mich. Sept. 25, 2013); *see also Morris v. Comm'r of Soc. Sec.*, No. 2:18-12090, 2019 WL 375572, at *13 (E.D. Mich. July 18, 2019) (collecting cases).

severity is not based on objective testing . . . ." (*Id.* at PageID.1789–91).

"Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989).  In other words, "the administrative law judge may not do anything expressly or impliedly in contradiction to the district court's remand order."  *Hollins v. Massanari*, 49 F. App'x 533, 536 (6th Cir. 2002).

The Court agrees that the ALJ did not comply with its July 2022 remand order—but not for the reasons Tina suggests.  To start, Tina overstates the scope of SSR 19-4p.  True, certain types of objective evidence, such as imaging, are not necessary to establish the existence of headaches.  *See* SSR 19-4p, 2019 WL 4169635, at *4 (Aug. 26, 2019).  And once an ALJ finds a medically determinable impairment that could cause headaches, he or she may not reject a claimant's reports of headaches "solely" due to an absence of "substantiat[ing]" objective evidence.  Yet both the regulations and SSR 19-4p require the Administration to consider objective evidence both when determining whether the claimant had a medically determinable impairment that could cause headaches and when assessing the impact of those headaches on the claimant's RFC.  *Id.* at *6–8; *see also* 20 C.F.R. §§ 404.1521, 404.1529(c)(2).

Consistent with these rules, the ME only assessed objective evidence to specify the medically determinable impairment underlying her headaches.  Indeed,

he explained that due to the paucity of objective evidence, he found that Tina had a medically determinable primary "headache" disorder rather than a "migraine" disorder—a more specific and "difficult" diagnosis.  (ECF No. 9-1, PageID.1256–57).  *See generally* SSR 19-4p, 2019 WL 4169635, at *3–4.  More to the point, the ALJ did not rely on the ME's testimony as to this issue.  In fact, he departed from the ME's opinions to find that Tina's "migraines' were a severe impairment, and in his RFC evaluation, he does not cite the ME's testimony in support of his conclusion that Tina's migraines did not impact her RFC.  (ECF No. 9-1, PageID.1227, 1230–31).

Still, the Court finds that the ALJ did not follow its instruction to "give *further* consideration" to the impact of Tina's headaches on her functional abilities.  (*Id.* at PageID.1281–86).  The evidence of Tina's headaches primarily comes from two medical appointments in April and October 2017.  At the first appointment, she reported having headaches three times per week.  (*Id.* at PageID.469).  Although she described the headaches as "mild," she also stated that they were "debilitating," "striking[ly]" painful, and "quite bothersome."  (*Id.* at PageID.469, 472).  Her headaches were sometimes triggered by stress and worsened by "light and noise."  (*Id.*)  She also stated that her headaches sometimes caused "blurred vision."  (*Id.*)  Her physician stated that Tina's symptoms were "fairly well controlled with medication," but, believing Tina's headaches to be caused by musculoskeletal issues,

decided to withhold medication and prescribe physical therapy "aimed at strengthening her cervical paraspinal muscles." (*Id.*)

At the October appointment, Tina again reported fifteen to nineteen headaches per month, "the majority of which [were] quite severe and debilitating." (*Id.* at PageID.468). Her physician did not mention the physical therapy plan she was to begin flowing her last appointment. (*Id.*) But noting that none of Tina's medications had any "significant benefit," her physician believed she was "a good candidate for a trial of Botox . . . ." (*Id.*) Although her Botox injections seem to have relieved her symptoms for months at a time, Tina did not receive injections until about twenty months after her alleged onset, and her symptoms would sometimes relapse between injections. (*See id.* at PageID.812, 896, 16401644, 1649, 1652–53). Apart from these two appointments, Tina's headaches are recognized in a series of treatment notes following the insured period, while Tina was treating with Botox. Although these notes indicate that Tina denied headaches, they also list her migraines as an unresolved pathology. (*E.g.*, 1181–82, 1186–87).

The notes from both appointments give conflicting accounts regarding the severity of Tina's headaches and the effectiveness of her treatment. But in the 2021 decision, the prior ALJ did not attempt to reconcile this conflicting evidence. Instead, he sanitized his summary of these records of any reference to Tina's light and sound sensitivity, her "debilitating" pain, or her ineffective treatment. (*Id.* at

PageID.1305; *see also id.* at PageID.1289).  And while the ALJ cited several records postdating the insured period in which Tina purportedly denied headaches, he did not explain why these records were probative of her symptoms during the relevant period.  (*See id.* at PageID.1289).

Although the remand order instructed the current ALJ to give "further" consideration to Tina's headaches, for the most part, his rationale mirrors the prior decision.  (*Id.* at PageID.1284).  Like the previous ALJ, he did not mention Tina's complaints of "debilitating" pain, nor did he mention her physician's note that her prescribed medications were ineffective.  (*Id.* at PageID.1230–31).  He did, however, mention that Tina's condition was "chronic" and that her symptoms were "aggravated" by "light and noise."  (*Id.*)  He also suggested that Tina experienced worsened symptoms in 2017 because she stopped taking marijuana.  (*Id.*)

But simply reciting this additional evidence does not explain how the ALJ concluded Tina's headaches caused no functional limitations.  Merely acknowledging this evidence does not explain why Tina's headaches did not cause functional limitations.  So without an explanation as to why the ALJ discounted evidence that Tina's headaches interfered with her eyesight and were frequent and "debilitating," the ALJ did not give "further" consideration to Tina's migraines, as required by the remand order.  *See Sullivan v. Hudson*, 490 U.S. at 886.  And even setting the remand order aside, the ALJ's opinion frustrates judicial review by

neglecting to explain why he disregarded evidence in weighing Tina's favor. *Gross*, 247 F. Supp. 3d at 829–30.

To be clear, the Court expresses no view on whether the ALJ reached a conclusion that he could have, with a more thorough discussion, supported with substantial evidence. The Court finds only that the explanation provided is too sparse to allow meaningful, judicial review. Thus, the Court remands this matter to the Administration, once again, for a more detailed explanation of how Tina's headaches impacted her RFC.

### 4. Cane

Last, Tina argues that the ALJ also violated the 2020 and 2023 remand orders by failing to either find that she required a cane or to adequately explain why he did not include such a limitation. (ECF No. 14, PageID.1795–1801; *see also* ECF No. 9-1, PageID.1026, 1284). In the 2018 decision, the ALJ found that Tina did not require a cane to ambulate. (ECF No. 9-1, PageID.992–94).

On appeal, the Court found that the prior ALJ's 2018 decision did not explain why the ALJ concluded that Tina did not require a cane. Despite evidence that Tina relied on a cane in some circumstances, the ALJ did not explicitly discuss why he did not include a "limitation specifically for cane use" in Tina's RFC. (*Id.* at PageID.1016–17). From his decision, the Court inferred two possible explanations for the ALJ's finding. Neither persuaded. First, the Court hypothesized that the ALJ

credited Tina's statements regarding the severity of her symptoms, but believed that a cane was unnecessary because he accounted for her impaired balance by finding that she required the option to freely alternate between sitting and standing throughout the workday. (*Id.* at PageID.1018–20). But that theory, the Court reasoned, did not explain why the ALJ still found that Tina could lift twenty pounds and occasionally stoop, kneel, crouch, or crawl. (*Id.*)

Alternatively, the Court speculated that the ALJ may have discounted the intensity of Tina's symptoms. (*Id.* at PageID.1019–21). But the same evidence he cited to shown that Tina's right hip had improved after surgery also established that her left hip continued to cause issues, that she sometimes displayed a limp even after her surgery, and that she reported using a cane to walk long distances. (*Id.* at PageID.1020–21). Because these medical records did not support the ALJ's findings on their face, "merely *citing*" those records did "little to *explain* why" Tina did not require a cane. (*Id.* at PageID.1021).

The ALJ here resolved this internal conflict—just not in a manner favorable to Tina. As in the 2018 decision, the current ALJ found that Tina could perform a limited range of light work with occasional postural changes, but he also found that Tina did not need to alternate between sitting and standing at will. (*Id.* at PageID.1228). Although this RFC reflected far fewer restrictions, it did so in a consistent manner.

Further, the ALJ explained why he found fewer limitations.  Unlike the 2018 decision, the current ALJ acknowledged that Tina's arthritis affected both her right and left hip.  (*Id.* at PageID.1227–33).  He also did not ignore reports that she used a cane to walk distances greater than five blocks or that she at least once displayed a "limp."  *(See id.* at PageID.509, 512, 515, 1230).  Yet the decision explains that Tina demonstrated little need for an assistive device.  Indeed, Tina only used a cane to walk "long[] distances."  (*Id.*)  She also did not always display a limp, and when she did, she attributed her limp to "stiffness" rather than pain and her providers described her limp as "mild" or "moderate."  (*Id.* at PageID.509, 512, 515, 518, 759, 762, 766, 774, 779, 782, 786, 789, 1230–31).  In fact, for all the evidence suggesting that Tina required a cane, there was also ample evidence that she had little difficulty walking.  For example, Tina displayed a "normal" gait at "multiple points" throughout the record.  (*Id.* at PageID.1232; *see, e.g.*, *id.* at PageID.759, 762, 766, 774, 779, 782, 786, 789).  She also routinely displayed normal strength, range of motion, and reflexes.  (*Id.* at PageID.1230–32).  Her right hip healed "appropriately" following her surgery, and she received injections in her left hip.  (*Id.* at PageID.898–903).  And based on those findings, the ME opined that Tina did not require a cane.  (*Id.* at PageID.1250).

At bottom, the ALJ explained why he discredited Tina's alleged reliance on a cane and imposed an RFC consistent with that view.  And not only did the ALJ

adequately explain his rationale, but he supported his finding with substantial evidence.  While the record may have contained evidence from which a reasonable person could find that Tina required a cane, at least some of the time, it also contained evidence suggesting that she could walk or stand unassisted throughout much of an eight-hour workday.  *See Cutlip*, 25 F.3d at 286.  Because the ALJ reasonably found that Tina could perform light work without a cane, the Court cannot disturb his findings on this issue.

### H.    Conclusion

For these reasons, the Court **GRANTS** Plaintiff's motion (ECF No. 14) **IN PART**, **DENIES** the Commissioner's Motion (ECF No. 16), and **REMANDS** the decision to the Administration for further review under Sentence Four of 42 U.S.C. § 405(g).  On remand, the Administration shall address (1) Tina P.'s ability to handle, finger, and feel objects and (2) the impact of Tina P.'s migraines on her functional abilities.  The Administration shall explain its rationale for these findings in enough detail to permit meaningful, judicial review.

Date:  April 17, 2024                         S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge